Case No. 17-5132 at L. John M. Fitzgerald at L. v. Federal Transit Administration at L. State of Maryland Appellant. Mr. McArdle for Federal Appellants Cross-Appellees FTA at L. Mr. Perlow for Appellants Cross-Appellees State of Maryland. Mr. Glitzenstein for Appellees Cross-Appellants John M. Fitzgerald at L. Mr. McArdle. Good morning, and may it please the Court, Kevin McArdle on behalf of the Federal Transit Administration. The appellants have agreed to divide their time. I'll be sharing my time then with Mr. Perlow for the State of Maryland. I'll be taking 13 minutes, Mr. Perlow will be taking 7, and I'd like to reserve 3 minutes for rebuttal. With the Court's permission, I plan to address first FTA's primary issue on appeal, whether the District Court erred in ordering FTA to prepare a Supplemental Environmental Impact Statement, an SEIS, to address Metrorail's recent safety and ridership issues. Then I'd like to address two issues that the appellants have raised on appeal. First, whether the FEIS properly focused on the final Environmental Impact Statement, the FEIS properly focused on the locally preferred alternative and the no-action alternatives. And second, whether FTA adequately analyzed the percolized potential growth-inducing impacts. At the onset, however, I think it's important to emphasize that this is a NEPA case, and NEPA has one overarching central objective, and that's to ensure that the agency considers the environmental consequences of its decision with the benefit of meaningful public participation before it takes action. I think in this case, in many ways, the plaintiff's claims don't implicate NEPA's core objective, but rather amount to a disagreement with the wisdom of the agency's decision to proceed with a light rail option. Trying to think about the District Court's perspective on this case, just assume for the moment the purple line is the stool and there are three legs to the stool, and one of those is the connection with Metro. And so questions have arisen about that leg in a very dramatic way in recent times. What's your response in that, looking at it from that perspective, as to why, in your view, the District Court abused its discretion? Well, Your Honor, I think the Marsh decision from the Supreme Court makes clear that the standard for determining whether an SEIS is required is the same as the standard for determining whether an EIS is required in the first instance. Does the new information indicate that the project will have any new environmental impacts that weren't previously analyzed? Your response is the footprint remains the same, but if under this concept that I suggested in my question, the nature of some of the footprint remains the same, but not necessarily the entire footprint, does it? Well, the environmental footprint doesn't change at all, and that's actually undisputed. There's no contention on appeal or even in the District Court that Metro's troubles will change the purple line's environmental impacts. Well, if Metro disappears or it becomes prohibitively expensive to ride Metro, won't that have an environmental impact? That would, Your Honor, affect perhaps the wisdom of the agency's decision to proceed or the validity of its decision under the substantive governing statute. But if there's no change in environmental impacts, then there's no basis for ordering a new environmental impact statement. And the changes that have been identified, is it the federal government's position then that those are just too minor to take into account? The green track, for example? Well, the green track was the subject of a detailed analysis prepared by the State of Maryland at FTA's request, and that detailed analysis illustrated that with or without green track, the project would result in a net improvement in stormwater treatment. So under your own regulations, that issue has been thoroughly addressed already? Correct. Can I ask a question about the regulations? Sure. How do you factor in the ridership data about Metro? The two regulations have different wording, the two regulations that are in play. But is your view that the difference in wording just doesn't have any difference in actual interpretation? That's correct in light of the Marsh decision, Your Honor, where the court made clear in a case where the court actually looked at the CEQ regulation, which is, I think, what Your Honor is referring to, that the standard under the rule of reason is, do the environmental impacts change and is the change significant? That's the sole question that needs to be answered for determining whether an SEIS is required. Let me ask you a hypothetical, which will help me figure out exactly what your legal position is. I appreciate it's not what you think is actually happening, so don't fight my hypothetical. Let's assume it. Imagine the new information is that very few people are now going to travel east to west, for whatever reason, because of Metro or whatever. There's this new evidence that very few people are going to travel east to west. It is true, as you say, that all of the build alternatives have the same footprint, but the bus alternative doesn't have the same footprint. One of the reasons for rejecting the bus alternative was roads are too congested, et cetera, et cetera. But if very few people are now going to travel east to west, then the bus alternative doesn't create as much congestion. Under those circumstances, would you still say that an SEIS is not required? Your Honor, very few people are going to travel east or west. That calls into question the entire purpose of the project. Right. Again, please don't fight the hypothetical here. In other words, what I'm asking is it's possible that the number of travelers could change in a way that affect the environmental consequences of a choice between alternatives. Do you agree with that? I know you don't think that happened in this case, but at some places in your brief you seem to be arguing that it's all about the environment and no changes in the numbers or economic consequences can ever be considered for purposes of deciding whether to have an SEIS. And I'm imagining a circumstance where the economic change, demographic change, whatever, is such that it makes a difference between two different alternatives, one of which has a lower environmental impact than another. But your hypothetical doesn't change the environmental impacts. It does between, in the way I'm asking you, doesn't it change it between two alternatives, between any of the build alternatives and the bus alternative? It changes the wisdom of the agencies to proceed with light rail. Well, let me just ask, let's proceed this because maybe I am understanding your legal point correctly, in which case I think you have a serious problem. So maybe think about this very carefully, okay? So the build alternative has environmental impacts for the trail. There's just no doubt about that. Correct. If there were another alternative which only required five more buses a day or something like that, had no significant new environmental impact, if you chose the build alternative, you would have a big environmental impact. If you chose the bus alternative, you would have a small environmental impact. Is that not the kind of change in environmental impact that NEPA requires you to analyze? Not just which you prefer, but you would need to examine whether it was reasonable or not to pick the obviously lower environmental impact rather than the obviously higher environmental impact. But suppose, Your Honor, that the environmental impacts of the bus service, the bus alternative that you've described, were thoroughly discussed in the EIS and they haven't changed at all. No, I understand that, and in the end you choose which alternative you want, but I'm asking about a change of information. Your original information was that there wasn't going to be any difference. You had enough east-west traffic that a bus alternative was not possible because of the congestion, et cetera. Now I'm offering you a kind of new information which makes that alternative possible again. Doesn't it have to be reconsidered under those circumstances? It sounds, Your Honor, to me, the new information bears on the wisdom of the choice and the appropriate remedy, if there were one, would be to challenge the agency's substantive decision on the grounds that the basis for the substantive choice of change. But since NEPA focuses on environmental impact... The new alternative I'm proposing would have an effect not on which one you like better but on the environmental consequences of each. Well, you're suggesting that there's been a change so fundamental that a brand-new alternative that they haven't studied. No, one that you did study, but you studied under an assumption of the number of riders that is no longer good. The Supreme Court's been pretty clear, though, Your Honor, that the information that NEPA requires an agency to consider is information about environmental impacts. And if that's been accurately and thoroughly disclosed in the EIS and the impacts haven't changed... Well, I'm going to ask this only once more to be sure that we're clear about this, but I think I'm now clear on what your position is. In other words, it only turns out that you would assume there are 100,000 riders and, therefore, your choice between the bus and a build was in favor of the bus, a build, because the bus would also cause environmental problems and wouldn't work. Now it turns out there's only going to be two riders, okay? And you now have a choice about building on the track in a way that hurts the environment or just putting five more riders on one bus. You don't think you have to reevaluate whether you've made the right decision to not choose the bus? I think in all likelihood you would, but it would be under the substantive governing statute because NEPA doesn't preclude the agency from making an unwise choice as long as the environmental impacts have been adequately disclosed and considered.  I see I'm already cutting into my rebuttal time. Any further questions for now? I'd save it if I were you. Okay, thank you, Your Honor. Good morning, Your Honor. Albert Furlow here for the State of Maryland. I have seven minutes. I'd like to reserve two minutes for rebuttal. Your Honor, Judge Garland, to pick up on your hypothetical, there is case law out there where courts have ordered an SEIS in a situation that you have outlined in your hypothetical. So you would not take the strong position that your colleague is taking? I think my position would be slightly more nuanced in the sense that if there is a change in circumstances that undercuts the fundamental purpose and need for a project, I think that needs to be looked at. Under NEPA? Pardon me? Under NEPA. Under NEPA. But practically speaking, my guess is that if that hypothetical was real, the project sponsor would look at this and say, what am I doing, I'm not doing this project, and pull out. Well, be careful here because I thought the whole premise of your position and the federal government was essentially everything's been studied to death here. What is being brought to the district court's attention now is something that was known, that was studied, was evaluated, and further, Maryland did this ridership scenario to respond to concerns about ridership. And it took the position that the Purple Line is not plagued by the problems that Metro is facing. So I think both the Chief Judge and I are just pushing a little to understand where the NEPA line ends and the wisdom of the project begins. And I thought the position that you were taking was we have studied everything. There's nothing new here. People continue to disagree about the wisdom of this project, but in terms of the NEPA issues, it's studied. There may be other statutes that come into play at the next phase that would require some further study, but not at the NEPA. That was my three-stool analysis. You know, one of the purposes falls out. What happened? No NEPA? Or is that just a policy question? Well, Your Honor, I think jumping out of the hypothetical that Judge Garland posed, in the current case, the issue was raised about impact of Metro Rail ridership on the validity of the Purple Line and the EIS there. And the state, in conjunction with FTA, did an analysis of what that impact actually would be, and it looked at the environmental impacts that would arise out of a decrease in ridership. It looked at whether or not the Purple Line as proposed and as the locally preferred alternative would continue to meet the purpose and need, and whether or not there needed to be additional analysis in a supplemental EIS. In doing that, the state developed a re-evaluation document that's in the record that proposed five different scenarios of levels of ridership of Metro at various levels of reduction all the way down to zero. And in looking at the extremely hypothetical and not reasonably foreseeable zero scenario, the analysis concludes and FTA concurred that even if there are no passengers going back and forth from Metro, which no one believes to be reasonably foreseeable, the Purple Line remains a valid project and the alternatives as analyzed are still sufficient because the Purple Line meets the purpose and need. And no one in the case has ever really posited as a possibility that Metro ceases to exist. Metro's currently carrying five to six hundred thousand people a day. Yes, there are acknowledged problems with Metro, but those are problems that three different jurisdictions are working together or trying to work together to resolve. The state has looked at the need for an east-west corridor transit line that connects Bethesda to New Carrollton and has decided that given the conditions that are there, it makes sense and is desirable to build a light rail transit line that connects those two endpoints, but also connects in between communities that are woefully underserved by transit to allow those people to get to the job centers. So that's to use Judge Rogers' illustration. So those are the two other legs. So if you're talking about the leg that only involves Metro Rail, because there's the two other purposes too. I thought part of your argument with respect to the one leg, which is the Metro Rail, is that even if you assume a situation in which ridership declines significantly, the question is whether that affects the choice in between the alternatives. And all of the alternatives seek to pursue the same purpose. And so if you have a decline in ridership vis-à-vis Metro, then of course that's going to have an impact on this leg, because we're talking about this leg basically dropping out of the picture because there's no Metro Rail ridership. But that's equally true of the other alternatives too, including the bus ones. They also seek to connect the Metro Rail stations. But if the ridership declines, then it's going to equally adversely affect those alternatives as well. Right. Yes, Your Honor, that's true. But to bring it out of the hypothetical into reality, and NEPA doesn't require agencies to engage in endless speculation. They require agencies to look at impacts that are reasonably foreseeable and look at things, you know, potential impacts, potential circumstances that are reasonably foreseeable. And the notion that Metro ceases to exist or that the 500,000 people who are currently or 600,000 people currently riding on Metro every day are finding some other way to get to and from their jobs or to new jobs is not reasonably foreseeable. There's no rule of reason that allows you to reach that type of conclusion and to examine that type of scenario. The state did it in its reevaluation as basically a check to see what happens if there are no riders. And what happens if there are no riders, then as is in that report and as FTA concurred, if there are no riders and people aren't riding Metro, then people are moving around by other means, which means that there's more congestion on roadways that would make a transit line between these two endpoints, connecting these various communities, that much more valuable. That was part of the analysis that was looked at, and it was determined that even in an extreme scenario, the Purple Line that connects these points on Metro, and these points on Metro aren't just Metro stops. They're MARC commuter train stops. They're bus transit stops. They're transit facilities that are a focal point for bus routes. So the project itself, even under an extreme reduction in ridership by Metro, remains a very valid and useful facility for the citizens of the state of Maryland. Okay. Thank you. Good to see you. Good morning. Mr. Furlow's acknowledgement that Chief Judge Garland's hypothetical would in fact require or could potentially require a supplemental deep analysis is interesting, but what's far more relevant to this court is the government's position, which is buried in their own decision document, that the only thing they looked at and will look at in a scenario like this is whether the environmental impacts of the particular option that's been selected have increased, that they do not look at whether the justification for the project has been in any way lessened. They do not look at whether other less environmentally destructive alternatives might come to the fore that have previously been rejected in light of new developments. And I respectfully submit to the court that's all as far as you need to go to resolve this case because that position makes no sense at all, and at the very least it warrants a remand for the agency to explain why that approach makes any sense either in the abstract, or I could also run the court through why it makes a difference in this particular case in light of the specific information that in fact has been brought to bear in terms of the ridership impact. Well, I think your argument proceeds on a number of assumptions, and we do have to look at the record that's before this court. And there is a thorough analysis of alternatives in terms of environmental impact. Would you agree with that? No, Your Honor, I would not agree with that. So that is not an issue that you have raised on appeal. Your Honor, we have raised an argument that the actual final EIS itself did not have an adequate comparison of alternatives in two basic ways. One, Your Honor, it only compared the final EIS, only compared Maryland's preferred choice to taking no action whatsoever, which we've submitted as an almost nonsensical comparison from any standpoint. Well, but I need to focus your argument, really, because I understand you can take the extreme positions, but I think we're more in the center trying to understand what the district court was concerned about in terms of the arguments you presented. And you heard me say to Counsel Maryland that I thought their position was we have studied everything, essentially, over these years, and what's coming to us now basically is asking us to reconsider some of the wisdom of what's happened, not significant new matter that hasn't been examined before. And I wonder if you could just focus on that aspect. Yes, Your Honor, I will, because I think that's a mischaracterization, both of what their argument has been as well as what the district court held. What the district court held is that from a NEPA standpoint, when you have a new development that calls into question in a serious way at least one, as Your Honor's own question posited, one of the three rationales for the project, that is the interconnectedness with Metrorail, but also calls into question the underlying fundamental rationale for the project as a whole. And in response to Judge Srinivasan's question about all of the alternatives being affected equally, Your Honor, if you look at joint appendix page 1199, which is Maryland's choice of alternatives, it was heavily dependent upon not only several of the rationales that have been posited here today, but also upon the ability to meet ridership projections beyond the year 2040, and was explicitly based upon the ability to meet a certain capacity. Now, this gets to one of the other questions that we have brought up, which has not been addressed to this point, which I think is very important, which is that we had experts submit more than 25 pages of detailed critiques, new critiques, Your Honor, in light of the ridership information in the Metrorail problems, explaining why alternatives previously rejected, including on the basis that the 2040 and beyond horizon was no longer of concern. What's your best affidavit paragraph that you're talking about? I have several, Your Honor. I only need the best. Well, I'll give you the best. I'll move on to second best later, but let's start with best. I appreciate that, Your Honor. If you look at Joint Appendix page 2306 through 07, which is Dr. Lisey explaining, among other things, that one of the critical assumptions that was made when an SEIS was not being prepared was that 27% of the ridership would be drawn from Metrorail. Okay, so that's not new information. That's his claim about what was already in it. Where is his statistical analysis of the change in ridership? Your Honor, if he didn't do his own statistical analysis, but what he did do is explain why the 43% figure is enormously important in light of the declining ridership. I got that part, but we're talking about new information about ridership. Where is his number as to what the new ridership is likely to be, and where is it supported? Well, he doesn't himself come up with his own analysis, but what I would also refer to, because I do think that... Give me the best sentence in his... I'm having trouble finding here what the new evidence is. Yes, everybody knows that Metrorail has gone down. The question is, what will it be like five years from now, ten years from now? I don't see any analysis in his affidavit of what it will be. Your Honor, these declarations were submitted on remand, not on an SEIS process. Just to be clear about this, we submitted these declarations three days after the district court remand, when the district court said the agency has to decide whether to do an SEIS. Yes, so in order to decide what it... Certainly it can't, or maybe you think it is. I'll ask you the hypothetical. In your view, if someone who is an expert announces your numbers are wrong and other numbers exist, but I'm not going to tell you what they are, I'm not going to do any kind of statistical analysis, I'm not going to do any kind of projection that can be evaluated, all I'm telling you is I'm an expert and I think your numbers are wrong. Is that enough to require an SEIS? I think it's enough to require the agency to respond to the critique. Okay, that's yet a different question. That they did not do. Let's do one question at a time. Is that enough to require an SEIS? An expert just says your numbers are wrong, but the expert does not tell you what the likely numbers are going to be. I think it's enough to establish, if the critique is sufficiently strong, that there is in the language of the CEQ regulation significant new information that bears upon whether the project should go forward in that form. In answer to Your Honor's question, I can give you... You didn't like my first one as much. Perhaps you might like my second one. I'm still waiting. Let me give you another citation, which is... We're skipping that one. I would like to explain why the 43% figure is very important, because it was not relied upon in the agency's own decision document, and they never explained why the 43% Metro Rail-related ridership was not the correct figure. So it's ultimately the agency's obligation to explain its decision. Well, what they've said... I mean, I do want to see the projection, but what their explanation is is even if it were that number, it wouldn't make a difference to us, and they explain why. Now, I appreciate you don't agree with their explanation, but they do say that any of a number of reductions from their original figure, not enough to make a difference in the environmental consequences. But you have another place where there's an actual projection? Well, there's another place where FTA itself used a different figure, Your Honor, and that is referred to in the declaration from Mr. Allen, who has been doing transportation modeling. And this is at page 2320 of the Joint Appendix, where he explains and makes sure I'm providing this accurately, Your Honor. All right. Mr. Allen explains in his declaration that according to a website, and this is new information, 2015 information, that FTA itself disclosed a ridership figure of 56,100 as the baseline figure. And they, in fact, use a number which is substantially higher than that in their analysis, which is almost 70,000 daily ridership. And Mr. Allen said if you use the FTA's own 2015 figure, which post-states the EIS, then even as a baseline matter in terms of looking at metro rail decline, you would have a much different number potentially. Now, that, again, is an issue raised by an expert with undisputed expertise, never addressed in the FTA's decision document. Actually, I mean, you keep saying these things, and I just have to say that's not the way the document reads, in all fairness. They did address decline in ridership and, you know, specifically incorporated by reference these types of analyses. And that's why I thought the chief judge was focusing you on what's new. That is new, Your Honor. That 2015 number. No, it's the difference between an expert saying I disagree. They know experts disagree because your declarations have been submitted twice, the same declarations, and then some new declarations. So they've been before Maryland and the FTA. What's new? Well, again, the declaration was submitted, but they didn't say anything about the discrepancies and the problems identified in the declaration that I would submit under this Court's precedent. Because they've already addressed that the ridership decline is not going to make a difference. That's what I'm trying to understand. In other words, the SEIS requires you to come up with significant new information that's not been addressed. Or you could say, I assume, adequately addressed. Well, our point is adequately addressed, Your Honor. There's no question they put out paper saying here's our ultimate decision. But if you look at, for example, page JA-2422, I think this answers your question specifically, and I hope answers Chief Judge Garland's question, where they refer to the baseline that they're using for the scenarios of 69,000. And Mr. Allen said your own more recent documentation shows that you should be using a much lower baseline figure. That was never responded to. And, in fact, the government in its reply brief says, well, if you look at a declaration that we submitted before the decision was made by an FTA official, Chief purports to explain that discrepancy on the grounds that it did not include special trips, University of Maryland trips and such. And that is simply not the case. And this highlights why we have problems in this case. If you look at their own EIS, and I'm referring specifically to Joint Appendix page 1271 through 72, in fact, that number did include special trips. If you look at Maryland's own analysis, which is Joint Appendix 2353, they acknowledge the 69,000 included special trips. So you have a flagrant inconsistency between the post hoc declaration that they're relying upon and the documents themselves, including Maryland's own analysis. And I say this not to convince the court that there's no possible answer to these points. I say it to convince the court that under this court's most basic standards of administrative review, not answering any of these concerns or answering any of these objections, we believe is an APA violation as well as failing to adequately address the issues from a NEPA standpoint. And in response to your Honor's question, we believe that the information does establish that the standard is satisfied for an SEIS. But at the very least, we respectfully submit that under the public employee's ruling from this court, there has to be some acknowledgment of these experts' views and some response on some of these discrepancies they came up with. Why isn't, it seems to, the nature of their response is a series of scenarios in which their number of east-west trips that come off of Metro have reduced significantly, even down to almost zero. And their position is, we're building this for three different reasons, back to Judge Rogers' three-legged stool, and that even if the number is reduced, and no one seriously, including your experts, say it's going to go to zero, even if it's reduced, the state still has an interest in helping people get from places where they live to places where there are jobs from east to west, and helping people between those two locations to get into either of the other two locations. If those purposes don't change, the other purpose, it may be slightly less valuable, but it's still there. And under those circumstances, there's no environmental difference. Why isn't that a good enough response, rather than having to engage directly with the numbers question? As long as their position is that the numbers don't matter, as long as we continue to believe there are people who want to travel east and west, your data doesn't go at all to either of the other two legs of the triad. It only goes to one. Well, certainly that's Maryland's position. The question is for the federal agency, which is being asked to give out nearly a billion dollars in money. The question is whether or less environmentally destructive alternatives. Just to be clear about this, because I haven't had a chance to sort of emphasize this, this is an environmentally destructive project. It's going on right now. Trees and forests are being destroyed in places of great importance to members of the local communities. It will destroy more than 5,000 acres of streams and other wetlands. It will impair historic neighborhoods. It will unearth more than 200 hazardous waste sites and result in stormwater runoff. They prepared an EIS because this had extremely significant direct impacts. Now, as your honors know, we've also raised an important issue that I think is adequately addressed in the briefs and happy to discuss further, that their analysis of indirect effects was completely lacking in our view, especially under the court's recent Sierra Club ruling, which says you actually have to engage in a serious analysis of indirect effects. But I think that's an important context, because under your honors' hypothetical, to the extent that a critical part of their objective was to meet certain ridership projections, and other alternatives may be able to further those objectives in a significant way without incurring as many, perhaps most of these impacts, that's precisely what the point of NEPA analysis is all about. The point of NEPA is to inform agency decision-making. All right, but in the final environmental statement, the federal government incorporated, by reference, the analysis of the several alternatives beyond the no-build and the local preference. Why isn't that sufficient? Well, there's two reasons, your honor. One, if you look at the final FTA decision not to do an FEIS, they didn't incorporate any alternatives analysis at all. No, I'm back at the FEIS. They did at that point. And at the FEIS, I'm sorry, your honor. So the analysis is there. And now the question is, did they have to do another environmental analysis because, as I understand it, in your view, they didn't adequately consider the alternatives? But that's the FEIS challenge, isn't it? Well, I think it's both, your honor. I mean, we do have the FEIS challenge because they ---- Well, it's both, but the district court rejected your challenges to the FEIS. That's true. Basically saying that there was. The district court didn't say this in height verba, but basically rejecting your view that there was an inadequate analysis of alternatives. And we respectfully disagree with the district court on that point. I understand you disagree with the district court, but if that is the district court's position, then on what basis could he order you to do an SEIS? Because what he said in both his merits analysis and his vacature analysis was that you have at the very least had new developments, which bear upon an aspect of the purpose of the project, which calls into question exactly, as we've been discussing, whether less environmentally destructive, and in his view of also importance, less financially impactful alternatives should be considered. And let me also answer, your honor, this way because I want to make sure I get this out before I sit down. There was an additional impact that has been raised by Dr. Lissy, which I did not refer to before, and that is the potential impact on what he refers to as the cannibalization of the ridership from the existing transportation systems. And so I think we are on sound ground in saying that. What does he mean by that? What does that mean? Yeah. Well, that means that if you look at their own rationale for the project, it will take ridership away from the existing resource impoverished or at least resource strapped system. Because one of the ostensible rationales for the project is that people who travel between metro rail, if you, for example, consider Bethesda and Silver Spring, will now take the purple line instead of traveling on the metro system. And the environmental impact of that? Well, to the extent that looking at the entire community in terms of how it's using a transportation system, nobody's disagreed that that is a part of an environmental analysis because ridership has an impact on other aspects, including development, et cetera. But even the... I understand you think people should be made to go all the way through the entire loop so that... Well, we're not saying that they should necessarily be danger. So that they pay fares to metro rail? Well, no. We're simply saying that that's an aspect of the repercussions of what they're doing that should be considered. Yeah, but what is the environmental repercussions of... The negative environmental repercussions of having people take a direct route across the U rather than taking an indirect route all the way through the... It has to be an environmental impact of some kind. Well, if it accelerates the demise of the metro rail system, that has an enormous impact on the entire community, including socioeconomic impacts, which under the CEQ regulations do have to be addressed. In fact... But they did evaluate. I mean, I thought maybe the strongest argument that they make about the environmental justice question is it allows people from the east to work in the west. Otherwise, their ability to work is very difficult,  And one of the purposes, as I understand in reading the EIS, is to enable people to actually get to work without taking an hour or more to get to work. How do you balance these off? Well, I don't think it's necessarily... That is ultimately the agency's decision to balance. All we're arguing, again, is a narrow, deeper point, that they have to at least adequately look at both the good and the bad. And that is what the court said in the Sierra Club decision recently in looking at the pipeline and whether or not there would be greenhouse gas emissions. We have to look at the good and the bad. And in the CEQ regulations, point blank say that the fact that an agency ultimately believes that a project will be beneficial does not mean you do not look at potentially adverse effects. And in response to Your Honor's question more pointedly, there are two elements to that. One is if it actually accelerates the decline of the metro rail system, that will have enormously negative impacts, especially when nobody knows where the money to operate metro is going to come from. And the second point in terms of those environmental justice effects, and I appreciate Your Honor bringing that up, one of the indirect effects issues that was not addressed is what's going to happen to environmental justice communities that cannot afford the increase in rents as well as the other increase in living expenses. They make a very brief mention of it in their underlying NEPA document. But as Casa de Maryland and others pointed out, there's no serious scrutiny of that impact. So I don't disagree with Your Honor that there may be benefits. Nobody's ever disagreed that there may be some benefits. But the NEPA question is have all the benefits and the costs been adequately considered, both underlying NEPA analysis and as a supplemental matter we respectfully submit that has not been the case. As Your Honor knows, we raised the green track issue as well. It's the one I haven't touched on. They clearly committed to doing this as a mitigation measure, particularly in the portion of the Capital Crescent Trail, a great concern to my clients. They just dispensed with that with no public comment, let alone a NEPA process. We respectfully submit that is also a NEPA violation and warrants some additional scrutiny. Further questions? Thank you very much. Since it came up on Mr. Gliffenstein's presentation, I'd like to just revisit your hypothetical to make sure there's no disconnect. One of the key objectives of this project was to facilitate east-west transit in the corridor. And if that objective goes away and the objectives of the project change, then we agree that a new EIS could be required because the objectives of the project dictate the reasonable range of alternatives. So if you change your objectives, then at least in some instances, you'd have to analyze a new range of alternatives that might achieve those objectives. But in that situation, we'd be talking about starting over. I think we're on the same page. I understand now. Let me just ask in response to a question I asked of your opponent, which was what part of the affidavit was most significant. And he pointed out that the expert says that your side's analysis of the baseline is incorrect, and not only incorrect but inconsistent with subsequent data from Metrorail. And that although you posited scenarios that go down from a baseline, you haven't posited ones that go down from the accurate baseline, at least as stated by the expert. And that your document rejecting the need for an SEIS doesn't address that question. Two responses. The first is these affidavits we're talking about were filed in the litigation. And in response to that very affidavit, we submitted a rebuttal affidavit explaining that the plaintiff's declarant was totally wrong because the two figures he was referring to were based on different metrics. So that was a litigation issue, raises a litigation issue, that we responded to and addressed. There was no need for us to go back and repeat the response in responding to the court's order to look at whether an SEIS was required. Can you just tell me which affidavit was your response? It's cited in our brief on this exact point. And also, much of the affidavits go to this issue of whether the initial ridership estimates were valid. And that was an issue at summary judgment that the court specifically reserved ruling on when he ordered us to address whether an SEIS was required. So that was not something we had to look at during the remand. That was a separate issue upon which he reserved judgment and ultimately ruled against the plaintiff that the plaintiff selected not to appeal. What do you think you were directed to look at on remand? To see how a change in metro rail ridership would affect our projections, which is exactly what we did. But not the specific change that their experts were talking about, not the reduction in the base? Well, we addressed that in the litigation when the affidavit was first filed. And also, I'd like to address a comment that was made that, well, all we looked at was whether there would be new environmental impacts, and that's totally incorrect. We also addressed whether the project would still meet the purpose and need, even in the event of a significant decline in metro. And we demonstrated that it would. The need for reliable east-west transit in the corridor hasn't changed. Purple Line will continue to address it. And the Purple Line will continue to facilitate connections to metro under any scenario in which the system exists. And we also critically, Maryland and FTA, Maryland in particular, explained why a decline in metro rail ridership doesn't change the comparative value of alternatives at all. And it doesn't enhance some unidentified, supposedly environmentally more benign alternative. The comparison of alternatives doesn't change at all. If the Court has any more questions. Thank you. Do you need time? I'll just give you a – I know you're over, but we let the opponent go over, so I'll give you a minute. Thank you. I actually just wanted to clarify one point that the opponent mentioned about ridership levels. And the implication was that Maryland selected the light rail in order to accommodate increased ridership levels. Well, that's true. It's absolutely true. But it wasn't increased ridership levels that were going to be on metro. It's increased ridership levels that are based upon the fact that population numbers are expected to rise over the course of the 30, 40, 50, 60 years that this project will remain in place. But some of that direct transfers between Bethesda and New Carrollton must be as a consequence of more riders on metro. Absolutely. So if there aren't more riders on metro, he has a point. Well, he has a point only but to an extent, Your Honor, because that just discounts the fact that ridership has come – there are 21 stations on this line, and ridership is coming from all 21 stations. And as the population level increases, the need for this facility becomes even more critical. Thank you, Your Honor. Questions? Okay, thank you. We'll take the matter under submission.
judges: Garland, Rogers, Srinivasan